**GIANOTOS v. UNITED STATES.**
No. 8892.

Circuit Court of Appeals, Ninth Circuit.
June 15, 1939.

John J. Taaffe and Morris Oppenheim, both of San Francisco, Cal., for appellant.

Frank J. Hennessy, U. S. Atty., and Valentine C. Hammack, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

GARRECHT, Circuit Judge.

Appellant, George J. Thomas and Mike Camebolis were indicted on three counts for violation of the Jones-Miller Act.[1] The first count charged that, on June 17, 1938, defendants fraudulently and knowingly imported 88 ounces of smoking opium into the United States contrary to law; the second

---

[1] 21 U.S.C.A. § 174: "If any person fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or assists in so doing or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported contrary to law, such person shall upon conviction be fined not more than $5,000 and imprisoned for not more than ten years. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

count charged that, on the same date, defendants fraudulently and knowingly facilitated the transportation of 46 ounces of smoking opium which had been imported into the United States contrary to law; and the third count charged that on the same date, defendants fraudulently and knowingly concealed 88 ounces of smoking opium which had been imported into the United States contrary to law.

Defendants Thomas and Camebolis pleaded guilty, but appellant entered a plea of not guilty and the case proceeded to trial as to him. The jury returned a verdict finding appellant guilty on all three counts of the indictment and on July 11, 1938, the court entered its judgment sentencing appellant to imprisonment in the United States Penitentiary for a period of 3 years and to pay a fine of $1,000 on each count, the respective sentences to be served consecutively. From this judgment the present appeal is taken.

From the evidence adduced on the hearing the following appears:

On June 17, 1938, members of the San Francisco Police Department arrested Thomas, appellant's co-defendant, at a parking lot on Ellis Street, in San Francisco. Thomas was searched and four 5-tael tins of smoking opium were found in his possession. The officers and Thomas then proceeded to the latter's room in the Hotel Mentone, but an examination of this room revealed no narcotics. However, at the time Thomas was searched, there was found upon his person a key to Room 612 of the same hotel, and an investigation thereof disclosed three 5-tael tins of smoking opium. Following a conversation with Thomas, and as a result thereof, Thomas and the officers went to Pier 32, San Francisco, where they joined several Customs officers and the entire party went on board the steamship Monterey. Here, with a key previously given the police officers by Thomas, the latter's locker No. 14, on board said vessel, was opened and six 5-tael tins and one 1-tael tin of opium were found therein. Thereafter appellant's locker was searched; no narcotics were discovered, but the officers found an improvised rubber belt with two elastics on each end, one roll of rubber, and one piece of tubing. Also, a card bearing the name of George Thomas, Mentone Hotel, San Francisco.

The evidence concerning appellant's complicity in the opium smuggling was obtained from the testimony of Thomas, appellant's co-defendant, who appeared as a witness for the Government. In substance he testified as follows:

Thomas and appellant had known each other for approximately a year and a half prior to the arrest, both men having been employed on board the steamship Monterey, Thomas as a bedroom steward and appellant as an oiler; that on a prior trip, Thomas and appellant had jointly purchased some smoking opium in Sydney, Australia; that appellant actually obtained the opium which he gave to Thomas, who brought it on board the Monterey, concealed it during the voyage and successfully smuggled it into the United States where it was disposed of by appellant; that appellant had given Thomas a rubber belt to use in taking the opium off the vessel. Also that Thomas had given appellant a card with Thomas' name and address, so that appellant could pick up the opium after it had been taken ashore.

Thomas further testified that he had no financial interest in the opium found in his possession at the time of his arrest; that he had procured it for appellant when the latter had threatened him with exposure for the opium smuggling of the previous trip. The arrangement was that Thomas was to pick up the opium in Sydney, bring it aboard the Monterey, after which appellant was to take it and smuggle it off the vessel; that when the vessel arrived at San Francisco, appellant insisted that Thomas take the opium off the vessel and when he refused appellant threatened to report to the Customs officers that Thomas had opium in his locker; that as a result of this threat and because he was afraid to remove the opium himself, Thomas enlisted the aid of Camebolis, who first took 3 cans of the opium off the vessel and brought them to his own room in the Mentone Hotel and later took 4 more cans of the opium off the vessel which he gave to Thomas; these were found in Thomas' possession when he was arrested.

Appellant took the stand on his own behalf, and while admitting the conversations with Thomas in regard to the opium smuggling, claimed that the overtures for the enterprise came from Thomas; that on neither of the two trips referred to in the testimony of Thomas had he fraudulently or knowingly imported or facilitated the transportation of opium into the United States, nor concealed the same; that as to the rubber belt admitted in evidence, he had used this to bandage his arm because at some prior date he had suffered an injury to this

arm which bothered him a great deal while working which the use of the bandage relieved; that the doctor who had treated the arm had used a similar bandage; that this rubber banding had been given him by Thomas who had ready access to the hospital supplies; that with reference to the card bearing the writing "George Thomas, Mentone Hotel, Room 401," found in his locker, this had been given him some time before by Thomas so that appellant might visit Thomas.

Upon appeal appellant assigns as error the admission in evidence of the testimony of Government witness Thomas as to the smuggling of opium by Thomas and appellant some three months prior to the commission of the offense set out in the indictment. Three assignments of error cover the same point and will be considered together.

It is contended the District Court erred in admitting the following testimony:

"When I first met Gianotos I did not discuss with him the idea of bringing smoking opium into the United States from Australia. No, I never have had such a conversation with him. The first time he mentioned it to me was about seven months ago on the steamship 'Monterey', and I think it was on a south-bound trip going to Australia. No one was present at this conversation but him and me. He asked me first if I wanted to take any chance taking opium to America. I told him I was afraid and wouldn't take any chance. That was all that was said.

"Later he asked me again, and I told him, 'I don't want to have anything to do with opium,' and I was afraid. I know it was going against the law. And then that was forgotten for a few days, and then it started on the trip before we started bringing the opium in.

"I said to Gianotos, 'I don't know, I haven't got any idea what to do with the opium, I don't want to buy it. If I had a whole lot of it, I wouldn't know what to do with it.' So he told me, 'I know a party in Sydney who handles it. I can easily buy it there for you and we can handle it on the ship, and when we get back to San Francisco I can sell it to you.' This was the first conversation.

"On the trip before I started to handle it I had another conversation, and that would be about three months ago. This conversation was on the way down to Australia. He told me he was ready for me to give him some money so he could buy opium for me, which was cheap over there, and he made pretty good dough in America, so he had been begging all the time, and I just fell that step, and I give him $120 on the day of arrival at Sydney—that was a Wednesday. He had a connection to buy it in Sydney.

"Mr. Oppenheim: I think the witness should relate the conversation rather than to give his conclusions.

"The Court. Q. As near as you can, state what was said by him and what you said. A. He had the connection in Sydney to buy the opium; so I give him the money, and he bought four tins for me and for my own use, and I think about six or seven for his own personal use, which he asked me to go to such an address and pick it up.

"Mr. Hammack. Q. Where was this address? A. I don't remember the number of the street.

"Q. In Sydney? A. In Sydney.

"Q. Australia? A. Australia.

"Q. Did you go to that address? A. Yes; I went there the same night.

"Q. What time of the night? A. About after eight o'clock, because I did not get through work until eight.

"Q. Whom did you meet there? A. I met Mr. Gianotos at the door.

"Q. That is, this defendant? A. Yes.

"Q. In the doorway? A. Yes, just right inside the door; the door go in, just right inside the door.

"Q. What happened? A. I took a package—

"Mr. Oppenheim. If your Honor please, that is objected to as incompetent, irrelevant and immaterial; no relevancy at all to the present charge. The defendant here is charged with having transported, concealed and imported certain opium. The witness is going far afield and talking about some other matter, some other can that was transported down under, the other end of the world, a long time ago, evidently not connected at all with the opium in question here.

"The Court: Proceed.

"I took the package of ten or eleven cans from Gianotos on the first trip and put it aboard the ship, the 'Monterey', put them first in my locker, and then put them in a passenger's stateroom where I hid them underneath the bed, between the springs. This was the trip before the last one. This was the first trip when I started to handle it.

"Mr. Oppenheim. On behalf of this defendant, I move all the testimony of the witness with reference to this particular opium, be stricken out on the ground it is incompetent, irrelevant and immaterial, no bearing on the issues in this case.

"Mr. Hammack. It is all preliminary, your Honor, leading right up to the instant charge which is the last, the June 17th trip.

"The Court. Objection overruled.

"Mr. Oppenheim. Exception."

Similarly it is contended the District Court erred in admitting the following testimony:

"Mr. Hammack. Q. Did you have any conversation with the defendant in connection with this opium on the return to Sydney, Australia? A. On the first trip—

"Mr. Oppenheim. Just a moment, please, I object to this question on the same grounds: Incompetent, irrelevant and immaterial, and no bearing on the issues.

"The Court. Overruled.

"Mr. Oppenheim. Exception."

It is further contended the District Court erred in admitting the following testimony:

"Mr. Hammack. Q. Did you have any conversation with the defendant Gianotos on this trip on the way back from Sydney? A. The last trip?

"Q. In connection with opium? A. The first trip?

"Q. Yes. A. After we left Sydney?

"Q. Yes. A. Yes.

"Q. What did he say? A. I had the stuff in hiding, and I saw Gianotos again after leaving Sydney, northbound, on the 'Monterey', so he told me to take—

"Mr. Oppenheim. May it be understood the objection runs to all of this testimony concerning this particular opium on this particular trip?

"Mr. Hammack. Yes.

"Mr. Oppenheim. And the objection is overruled, and an exception is noted?

"The Court. An exception will be noted."

Appellant argues that evidence of offenses other than that charged in the indictment cannot be introduced for the purpose of proving the charge laid in the indictment.

■ As pointed out by appellant, "The general rule is that, on a prosecution for a particular crime, evidence which in any manner shows or tends to show that accused has committed another crime wholly independent of that for which he is on trial, even though it is a crime of the same sort, is irrelevant and inadmissible." 16 C.J. § 1132, p. 586.

■ However, there are a number of well-recognized exceptions to the rule excluding evidence of other offenses and these exceptions are founded on as much wisdom and justice as the rule itself. Here we concern ourselves with but one of these exceptions. "It often happens that two distinct offenses are so inseparably connected that the proof of one necessarily involves proving the other, and in such a case, on a prosecution for one, evidence proving it cannot be excluded because it also proves the other." 16 C.J. § 1134, p. 588.

As preliminary to the discussion of the strictly legal aspects of the objections involved it should be pointed out that the witness was permitted to state without any objection, even with a certain amount of encouraging guidance from appellant's counsel, much concerning the previous collaboration in crime between the witness and appellant. It was not until after the joint action in relation to dealing in narcotics had been brought out that any objection was made, although at the conclusion of this line of testimony appellant's counsel did move to strike out all reference to these previous instances. It also must be noted that in most instances it appears that the objection was not interposed until after the answer had been given.

■ The witness Thomas had testified that he had no personal financial interest in the opium found in his possession but that he had hidden the narcotics on the ship and had induced their co-defendant, Camebolis, to bring in some of the drug because he was intimidated into doing so by appellant's threats to disclose that Thomas had been guilty of these prior wrongdoings. This putting in fear was an important contributing element in effecting the offense charged and it was not error in these circumstances to have the witness state that this fear under which he acted was superinduced by appellant's threat to reveal their previous association in the former crime.

■■ The purpose of this evidence relating to the former crime was not to establish the commission of a distinct offense, but it became related to the instant case when the witness testified the appellant demanded and insisted that he take part in this crime and put him in fear by threats to reveal his part

in a former crime, jointly committed by them. Appellant, thus, by his own acts connected the former crime with this crime which made the testimony admissible for its bearing on the crime under investigation. The applicable rule of law is thus summarized: "In proving a crime, all the res gestae may always be shown, though it involve proof or evidence concerning the commission of another and independent crime by the defendant at the same time." 10 R.C. L. §§ 107–109, p. 940. The admission of this evidence was not error.

Appellant also urges that the lower court erred in refusing to permit counsel for appellant to inquire as to whether Thomas expected leniency for his testimony. The following excerpt, taken from the cross examination of the witness Thomas in the lower court, is the basis for the asserted error:

"Mr. Oppenheim: Q. You do expect leniency in this case, don't you, for having testified here? A. Well, I have put in a plea of guilty, they know what that means, —a plea of guilty.

"Q. I want you to answer my question. A. Well, I am telling you what I know.

"Q. Will you answer the question? I know you pleaded guilty; but will you answer the question?

"The Court: The question and answer will have to stand. We will have to proceed."

Counsel for appellant made no objection to this ruling of the court, if such may be termed a ruling, nor was any exception taken. Appellant contends, however, that notwithstanding the failure of his counsel to take an exception to the ruling of the court, nonetheless he did not waive his right to assign this ruling as error; that the reason for an objection to the court's ruling or an exception thereto is for the purpose of presenting the point clearly to the court, and from the text above the court fully understood that appellant's counsel was inquiring into any motive that might have existed in Thomas' mind for testifying.

Although the fact that no objection was made to the alleged erroneous ruling of the court below would not preclude this court from considering the matter on appeal, we are of opinion that no error was committed and the assignment is without merit.

Counsel for appellant propounded a question to the witness who made answer, which, although somewhat evasive, tacitly implied that while he had not been promised he expected some consideration for having pleaded guilty and testifying for the government. Counsel apparently accepted this inference and made no further inquiry in this regard, but entered into another phase of the cross examination of the witness. No objection was made to the alleged erroneous ruling and no effort to advise the court that counsel regarded the answer as not responsive to the question asked. Alleged error should be challenged during the proceedings in the trial court and not for the first time on appeal.

We have carefully examined the record and find no error therein, and as appellant has had a fair trial, with zealous regard for all his rights, the judgment of the District Court is affirmed.