## HALLINAN v. UNITED STATES.
### No. 12424.

United States Court of Appeals
Ninth Circuit.

May 23, 1950.

Rehearing Denied July 13, 1950.

George Olshausen, San Francisco, Cal., Robert W. Kenny, Los Angeles, Cal., for appellant.

Frank J. Hennessy, U. S. Atty., Joseph Karesh, Robert B. McMillan, Asst. U. S. Attys., San Francisco, Cal. (James M. McInerney, Asst. Atty. Gen., James W. Knapp, Atty., Dept. of Justice, Washington, D. C., of counsel), for appellee.

Before DENMAN, Chief Judge, and STEPHENS and ORR, Circuit Judges.

ORR, Circuit Judge.

Appellant appeared as attorney for the defendant in a case entitled United States of America v. Bridges et al., D.C., 87 F. Supp. 14. The action was tried in the United States District Court for the Northern District of California, Southern Division, Honorable George B. Harris, District Judge, presiding.

During the course of the trial a judgment of contempt was rendered against appellant. He appeals and makes the following principal contentions:

1. The record does not show contempt.

2. That by waiting one day subsequent to the commission of the alleged contempt, the Court lost its power to punish summarily under Rule 42(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., but could proceed only on notice and hearing under Rule 42(b). Furthermore, since the matter is properly under Rule 42(b), the Court was disqualified to pronounce judgment.

■ The trial Court filed a certificate setting forth the facts on which it based the judgment of contempt, in conformity to the requirements of Rule 42(a). Consideration of the questions involved requires a rather lengthy statement of the conclusions reached by the Court and the references to the record, as set forth in the certificate. At times we make reference to portions of the record not referred to in the certificate: this for the purpose of assisting in our determination of whether the conduct of defendant, upon which the judgment of contempt was predicated, was in good faith. The portions of the record to which we refer were designated by appellant on this appeal. In considering portions of the record not referred to in the certificate we have not overlooked the requirement that if the judgment is to be sustained the conduct complained of in the certificate must in itself constitute contempt. We find that it does.

The rulings and assertions made during appellant's opening statement contain several lines of thought. For clarity we consider these rulings and assertions separately according to the subjects with which they deal. The first of these subjects is labor union disputes.

In pronouncing the judgment of contempt the Court states: "Mr. Hallinan, unbridled again, lapsed into a violation of the orders. At page 550 the Court had occasion to sustain an objection interposed by Mr. McMillan to matters that should not have been brought in on an opening statement and to matters which should not have been brought before the jury." The record pertaining to this incident shows the following:

In the course of his opening statement appellant stated: "Now, Mr. McMillan says that they will bring into this trial certain labor leaders, former associates of Harry Bridges. Unfortunately they will, because the labor movement, as you may have all observed, at times in its career turns back on itself and rends and destroys itself and engages in internecine quarrels that destroy its utility." The Court thereupon "admonished" appellant that "we are not trying warfare or alleged warfare between any union or any group and the like." While the certificate makes no reference to prior admonitions the record discloses this to be the fourth time after appellant began his opening statement that the Court had expressed the opinion that historical accounts of labor union activities in which Bridges had taken part were immaterial, were inflammatory or were far divorced from the indictment before the court.

Subsequently, appellant again began a recital of a history of the growth of the C.I.O., and its expulsion from the A.F.L., which was said to have been accompanied by charges that the C.I.O. and certain of its leaders, including Bridges, were communistic. This recital was objected to and the objection sustained. The Court, in its certificate, then refers to a "long disserta-

tion" by appellant concerning "some internal warfare between the C.I.O. and the A. F. of L." It appears of record that immediately after the sustaining of the above objection, appellant made some statement concerning the affiliation of Bridges' I.L.W.U. with the C.I.O. and began a further discussion of a Maritime Federation of the Pacific. Objection was again made and sustained. Immediately thereafter, in disregard of the ruling, appellant continued with the discussion of the Maritime Federation of the Pacific, and its alleged control by Harry Lundeberg, who appellant stated would be a government witness, and to whom he referred in derogatory language. Objection was made and the Court said: "What Mr. Hallinan has to say is in reality that type of matter that may be reserved for closing argument, if the facts demonstrate it. * * * I think, Mr. Hallinan, that these excoriations and vituperative matter bearing upon Mr. Lundeberg and others has no place at the present time." The certificate recites that only a few seconds or minutes later, appellant again "launched into the same demeanor, same conduct, persistent, studied as it was." From the record we learn that when appellant resumed his opening statement, his very first sentence had to do with quarrels between Bridges' union and the A.F.L. He went on to charge that Lundeberg and another labor leader were joined in their fight against Bridges and the latter's union by employer groups, goon squads, killers and perjurers. After the statement that certain government officials also joined in this persecution of Bridges, although other "upstanding, granite-honest" government officials had gone out of their way to protect him, another objection was interposed and sustained. Immediately thereafter appellant said, "the strength and extent to which these people were willing to go may be learned from the fact that as early as 1936 they caused a warrant for Mr. Bridges' arrest on a deportation inquiry to be issued by the Secretary of Labor." Appellant also referred to the passage of a "bill of attainder" against Mr. Bridges by the United States House of Representatives, and also stated that "Mr. Bridges has made the mistake of not taking the $50,000 that was offered to him back in 1934 to throw the strike and go back to Australia." Again objection was made and again sustained, and appellant then referred to the labor situation in Hawaii as "the renewal of about what had happened in San Francisco—poison gas and clubs for the workers * * *." Again objection was made and again sustained.

The next type of matter found in the opening statement consists of direct attacks upon the credibility and character of anticipated opposing witnesses. The Court, in the absence of the jury, stated that in its opinion appellant had, in his opening statement, been "anticipating much of the Government's case, indulging in speculation on speculation," and "creating an atmospheric quantity at this stage designed to prejudice and inflame the jury." Reference is made to Government counsel's statement as to the position of the Government. This, the record discloses, was to the effect that appellant was not entitled to attack the credibility of prosecution witnesses in the opening statement. Appellant then resumed his opening statement. We learn from the record and certificate that appellant referred to Harry Lundeberg as "one of the most remarkable of the witnesses that will be produced," "like a character from Jack London, a typical bucko mate, with a reputation for violence and ferocity as wide as the Seven Seas, a man who has been arrested for brawling and assaults in half the courts of the world." Objection was again made and the Court stated: "This wild anticipation of the Government's case is to my mind novel," and ruled that "these excoriations and vituperative matter bearing upon Mr. Lundeberg and others has no place at the present time." The Court also specifically instructed the jury to disregard the statements about Lundeberg's arrests in all parts of the world. Only a few seconds later, appellant "launched into the same demeanor, same conduct, persistent, studied as it was." The subsequent statements included assertions that the defense would prove that Lundeberg and another labor leader employed a known murderer to kill Bridges and did in fact send a man to New Orleans

who killed a C.I.O. organizer there. Appellant also asserted that the labor leaders had under their control goon squads, killers and perjurers.

Appellant further stated: "Now, as early as 1936 there had been introduced into Harry Bridges' union and into his personal office as his private secretary a woman employed by the Waterfront Employers Association, and she was also the mistress of Mr. Harry Lundeberg." Objection was made and appellant gave as justification for the statement his purpose of showing Bridges' consciousness of being watched by agents of his enemies, who would use against him any detected activities in the Communist Party. The Court then said, among other things, that an opening statement was not a sounding board for giving vent to immaterial matters, and that it was very unfair to make such a reference to the woman. After some discussion, the Court stated to appellant: "You characterized all of these witnesses as perjurers, low people, characterized them with vile, vituperative terms. 125 in number. I do not know at the present time the identity of any witness about to be called for the United States Government, and I dare say that in large you do not. Now I think it highly unfair to this Court, indulgent as I have been with you, to continue on that line or that particular vein."

The certificate quotes a subsequent statement by the Court, "again responding to an objection urged by Mr. McMillan, and to matters that were incompetent and irrelevant." It is shown by the record that these matters were specific references to three named individuals who appellant asserted were ex-Communists and would be Government witnesses. Each of the references also included derogatory remarks. The Court then remarked: "What you propose to do is perfectly plain to me, Mr. Hallinan, and that is to assassinate in advance every witness who might take this stand without any evidence before this court of the general characterizations and vituperations." The record shows that this remark of the Court was made the basis of a ruling. Appellant replied: "All right, and that is just what I

say, your Honor." The Court answered: "That procedure * * * has never been the procedure in the federal courts. I sustain the objection."

Later in the certificate reference is made to another objection. The record discloses the objectionable statements to have constituted a wholesale attack on 125 persons who appellant asserted would testify for the Government. Appellant accused them of traveling "any place where they could pick up a few honest dollars of government treasury compensation testifying against Communists here, labor leaders here, school teachers there, willing to say anything that would bring them a few dollars * * * for fame or what they call fame * * *. They are perjurers of the worst kind * * * spies, turncoats, the very swill of humanity * * *."

Another subject of rulings and statements was the asserted wire-tapping and "espionage" activities of Government agents against Bridges. Appellant stated that in Seattle in 1937, "agents of the Immigration Department dictographed his [Bridges'] hotel room and tapped his telephone wire." The Court interrupted and the prosecutor, upon inquiry from the Court, renewed his assurance that no illegally obtained evidence would be introduced. The Court then ruled as follows: "The objection is sustained, the jury is admonished to disregard the statement, of any kind, character or description, bearing upon that matter."

Appellant made a subsequent reference to espionage activities of the F. B. I. against Bridges. Objection was again made and again sustained. Almost immediately after the sustaining of the objection appellant referred to "the boyish workings of the F. B. I." and stated that the defense would prove that scores of F. B. I. agents had for years been following Bridges, interviewing and threatening his friends and associates, trying to build up a case.

Two incidents occurred during arguments addressed to the trial Court which it deemed contumacious. Appellant referred to the fact that he had only three weeks to prepare. The Court asked him if he did not have the assistance of associate counsel.

Appellant replied: "Yes—who made the motions that your Honor treated with contempt."

Appellant referred to headlines in newspapers which the trial Court characterized as "again transcending, bridging, the orders made by the Court with reference to news articles." In this connection appellant said: "Did your Honor see the headlines in today's papers, which said that the Government was going to prove not only that Bridges was a member of the Communist Party but had been elected to high office in it?"

■ It is appellant's contention that in his opening statement "he tried to tell the jury *first* that he expected to show government witnesses to be liars, perjurers and low characters, who had conspired to give false testimony against Bridges. *Second*, that the motives for giving such false testimony were to be found in hatreds engendered by labor disputes in which Bridges had taken part. *Third*, that some of the witnesses had appeared in proceedings to deport Bridges", and that the matters referred to constituted a valid defense. We are unable to view the statements and conduct of appellant in such a mild and diluted form. It is true that counsel might properly inform the jury in a temperate manner that he intended to impeach the veracity and character of opposing witnesses by the introduction of competent impeaching evidence. Appellant did no such thing, however. The most abusive language used and the vilest characterizations made were not in the form of a statement of what was expected to be proved but a direct statement by appellant of his opinion of the witnesses. No other motive can be attributed to such statements and conduct than that appellant deliberately sought to inflame the minds of the jurors and unduly prejudice them in advance of the appearance of any witness in the witness chair. Appellant complains that the opening statement was continually interrupted by government attorneys. We think properly so. Objections were interposed by counsel and rulings made by the Court, which were disregarded. Justification for such conduct is attempted to be made upon the ground that the matters stated constituted a valid defense. Counsel's opinion of the character of witnesses who he thought might be called was not evidence. He could not validly say that he would prove the statements made because no witness would be permitted to hurl the epithets which seemed to flow from the mouth of appellant with such ease and facility. Of course, counsel may, and often does, in argument to the jury, after the evidence has been presented, give the jury the benefit of his opinion of the veracity of the witnesses and the character and weight of testimony presented. That is the orderly manner and proper time to do so and the full duty which a lawyer owes to his client in this respect may then be fully discharged. A trial court has the duty of safeguarding the rights of all parties before it, and the United States of America was a party to the criminal action. Witnesses required to appear are entitled to protection from unjustified character assassination and vilification and a court is not in a position to determine the extent to which it may properly allow counsel to comment upon the character of a witness or the weight and credibility of his testimony until that witness has testified.

■■ Appellant says he had a right to make an opening statement. Of course he had, so long and to the extent it remained within the bounds of propriety and good faith. We find neither in the conduct complained of here. It is urged that the opening statement should have been allowed to proceed and the evidence ruled on when offered. Not if improper. It must be kept within proper bounds, otherwise all manner of irrelevant and extraneous subjects could be stated to the jury and, in the absence of good faith, counsel could thus place before a jury much that he well knew could not later be introduced into evidence. If it be true, as appellant maintains, that the matters which he proposed to prove were entirely proper as a defense his remedy was on appeal, not to wilfully disregard the rulings of the Court. United States v. Bollenbach, 2 Cir., 1942, 125 F.2d 458. He would have, in subsequent offers, ample

opportunity to protect his record. Appellant criticizes a statement of the trial court that an attack cannot be made on witnesses in advance as nonsense from the standpoint of reason and authority but it is not nonsense from the standpoint of reason and authority to say that in an opening statement you cannot resort to a blanket castigation and vilification of witnesses; especially is this true where the vilification and castigation is an expression of counsel's own opinion.

■ Appellant argues that the opening statement he was making could not have been curtailed without endangering the defense. We see no force to this argument. The ruling of the Court should have been complied with. The record was sufficiently definite to have permitted a review by an appellate court of the question of whether the opening statement had been unduly limited. Sunderland v. United States, 8 Cir., 1927, 19 F.2d 202, 208, 210–211.

We now consider the charge of contempt as it relates to the cross-examination of witness Garner. It is charged in the certificate that "Mr. Hallinan had launched into a dissertation upon the deportation proceedings." The trial court in making this statement apparently referred to a question put by appellant in the cross-examination of the witness Garner, who had identified himself as an attorney for the Bureau of Immigration and Naturalization. The question was: "Is it your custom, as an attorney for the Government to keep abreast of the current decisions of the Supreme and Circuit Court of Appeals relating to immigration matters?" In response to an objection made by the Government the Court stated that no issue with respect to the prior deportation proceedings against Bridges was before the court and that what the witness had done "with respect to matters of prior consequence" would not help determine any issue in the case before the court. It appears that almost immediately after this ruling was made appellant asked two other questions concerning the witness' acquaintance with the decisions in the prior deportation proceedings. There followed a prolonged argument by counsel on both sides,

most of which was outside the presence of the jury. The certificate quotes the reiteration, during this argument, of the Court's ruling that "these matters of prior consequence [have] no legal bearing upon this matter." Appellant's response to this ruling was: "I will simply have to take the position, your Honor, that I consider very much in error your position, and I will have to continue to ask the questions and build a record and ask such questions as I may deem advised, and I say that you have no right to make your mind up as to whether a conspiracy of these witnesses exists or does not exist; that that is something direct to the jury."

The record discloses that the very first question asked the witness Garner by appellant after the jury was reseated was: "If you did not read all the decision of the Supreme Court, at least you read most of it, is that right?" Objection was made and sustained. The question immediately following was: "Now, did you read that portion of the decision of the Supreme Court of the United States which charged the federal agents with illegal wire-tapping of Harry Bridges?" Objection was made and sustained.

Later came a question with respect to the witness' knowledge of wire-tapping prior and up to the time that Bridges was admitted to citizenship. Objection to this question was made and sustained. Another question concerned the witness' knowledge of wire-tapping at the time of the two previous deportation proceedings. Objection was made and sustained and the jury admonished to disregard any implications in the question. The witness was asked by appellant whether he had had any knowledge of wire-tapping before the deportation proceedings, whether he had protested against illegal wire-tapping, whether he had stated to any government official that he would not be a party to an illegal effort to injure Bridges. Objections to all these questions were sustained. The witness was then asked whether he had read in one of the prior deportation proceedings that 62 government witnesses had been rejected by the trier of fact as liars and perjurers. The

objection to this question was also sustained. It was followed by an almost identical question with reference to a different prior deportation proceeding.

A later question was whether the witness had participated in the installation of a wire-tapping device in Bridges' room in a named hotel in Portland, Oregon, prior to the 1939 deportation proceedings. The next question was whether the witness had participated in wire-tapping of Bridges in a New York City hotel in 1941. The next question was whether the witness had any contact with any government employees who were engaged in such wire-tapping. Objections to all the above questions were made and sustained.

Appellant extensively argues the general propriety of bringing in the defenses disclosed by the above related questioning. The vice found here is not in bringing in the defenses but the manner in which it was attempted to be accomplished. All practitioners know that in the trial of cases courts and lawyers often disagree as to the admissibility of evidence. It is further generally recognized that the trial Court has the duty of determining the question of admissibility for the time being at least and that when the Court has spoken, upon counsel is then imposed the duty of abiding by that ruling. The error, if any, is to be corrected elsewhere. But, argues appellant, before the alleged error can be considered elsewhere, the record must be sufficiently explicit to enable a reviewing court to understand the nature and purpose of the excluded evidence. With this statement we are in entire agreement but are unable to find in the record before us justification for the conduct of appellant on that ground. We think appellant went far beyond the necessity of making a record and that his conduct shows a deliberate and studied design to ignore the rulings of the Court in order to get before the jury the excluded matter. A sufficient record was made long before appellant desisted.

We have examined the cases cited by appellant in support of his argument that an attorney is not in contempt when he continues to ask questions regarding earlier proceedings after an initial adverse ruling.[1] We fail to find in the cited cases a comparable situation to the case at bar. The conduct of appellant in our opinion is inexcusable on any of the grounds urged. We realize the inadequacy of the cold record to fully present the situation as it existed in the court room during the turbulent times portrayed by this record. We do note an attitude of patience and forbearance on the part of the trial judge which continued until the authority of the Court was so flagrantly and openly defied that a contempt judgment was justified and merited if not openly invited.

It is said that the Court lost jurisdiction to proceed under Rule 42(a) by waiting from the adjournment of court on the evening of November 21, 1949, until 9:30 a. m. of November 22, 1949, before pronouncing the judgment of contempt. We do not agree. In re Maury, 9 Cir., 1913, 205 F. 626; United States v. Sacher, 2 Cir., 1950, 182 F.2d 416.

Criminal Rule 42(a) provides: "(a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record." We think the word "summarily" does not require hasty determination and that the night hours spent by the judge in preparing his summation for his contempt order, delivered on the following morning, are not an improper incident to summary action.

Complaint is made as to the severity of the sentence. It is severe. We are unable to say the Court abused its dis-

1. Sprinkle v. Davis, 4 Cir., 1940, 111 F. 2d 925, 930, 128 A.L.R. 1101; Caldwell v. United States, 9 Cir., 1928, 28 F.2d 684; Fidelity & Deposit Co. v. Lind- holm, 9 Cir., 1933, 66 F.2d 56, 89 A. L.R. 279; Gianotos v. United States, 9 Cir., 1939, 104 F.2d 929.

888

cretion in imposing it.[2] Gross misconduct merits commensurate punishment. We cannot have the same appreciation of an existing situation, from a review of a cold record, as does a presiding judge who witnesses the transgressions and senses the unfavorable impact upon the orderly administration of justice. An officer of a court has a higher duty to assist in maintaining the dignity and integrity of courts than does the ordinary citizen. True, every lawyer, if he is worthy of the name, must use every legitimate effort in support of his client and in so doing will be relieved from an improper contempt judgment. Caldwell v. United States, 9 Cir., 1928, 28 F.2d 684. No such condition exists here. The record reflects quite the contrary. From cases cited in the briefs we learn that appellant has on two occasions been held in contempt of a state court.[3]

Judgment affirmed.

2. In re Maury, 9 Cir., 1913, 205 F. 626, 632; Huffman v. United States, 10 Cir., 1945, 148 F.2d 943; Compare sentence imposed in Fleming v. United States, 9 Cir., 1922, 279 F. 613.

3. Hallinan v. Superior Court, 1925, 74 Cal.App. 427, 240 P. 790; Ex parte Hallinan, 1932, 126 Cal.App. 121, 14 P. 2d 797.