**In the Matter of Stanley S. COHEN.**

**No. 72 Cr. 941.**

United States District Court,
S. D. New York.

Dec. 3, 1973.

Paul J. Curran, U. S. Atty., S. D. N. Y., New York City, for the United States; Henry Putzel, III, Asst. U. S. Atty., of counsel.

Barry Ivan Slotnick, New York City, for respondent; Bertram Zweibon, Stanley Cohen, New York City, of counsel.

EDWARD WEINFELD, District Judge.

Stanley S. Cohen (hereafter respondent) was cited for criminal contempt of court in violation of 18 U.S.C., section 401(1)[1] for misbehavior in the course of a criminal trial presided over by Judge Dudley B. Bonsal, wherein he was counsel for the defendant, one Stuart Cohen. The trial commenced on March 12 and was concluded on March 26, 1973, when the jury returned a verdict of guilty.[2] On March 30, 1973, Judge Bonsal issued the contempt citation, pursuant to Rule 42(b) of the Federal Rules of Criminal Procedure,[3] which he referred to the Chief Judge of this Court for the designation of another judge to hear and determine the charges; this Court was so designated.[4] The citation was duly served upon the respondent, who appeared by an attorney who represented him throughout these proceedings. Upon representations made by the government at a pretrial conference, with

1. "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice; . . . ."

2. An appeal from the judgment of conviction is pending.

3. "(b) *Disposition Upon Notice and Hearing.* A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. . . ."

4. *Cf.* Mayberry v. Pennsylvania, 400 U.S. 455, 464, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); Cooke v. United States, 267 U.S. 517, 539, 45 S.Ct. 390, 69 L.Ed. 767 (1925).

the defendant's acquiescence and the Court's approval, the trial was nonjury.[5]

■ Before considering the citation, it is desirable to set the matter in proper focus. Rule 42 is a means of "vindicating the majesty of law, in its active manifestation, against obstruction and outrage."[6] Whether the summary procedure under subdivision (a) of the Rule is invoked by the trial judge in whose presence the alleged conduct is committed or the notice and hearing procedure before another judge under subdivision (b) is applied, the purpose of the Rule is to assure the integrity and efficiency of the judicial process. The Rule protects the right of counsel to be a fearless, vigorous and effective advocate of his client's interest, but rejects the concept that contemptuous conduct is to be equated "with courage or insults with independence."[7]

The citation was based upon thirteen (13) incidents occurring at various times during the trial. As to each, Judge Bonsal specified the pages of the trial record,[8] but did not enumerate each as a separate charge. Although, upon the hearing,[9] these incidents, for convenience, were referred to by counsel as numbered specifications or particulars,

this Court indicated its determination would be based on the totality of the cited occurrences as charging a unitary offense.[10] In addition to the acts or statements contained in the trial transcript, the government, to support the charge, relied upon the testimony of one of Judge Bonsal's law clerks,[11] who was present throughout the entire trial and who described the respondent's expressions, manner of speaking, bearing and attitude with reference to each cited particular.[12] The respondent testified on his own behalf, giving his version of the events; in general he urged mitigating circumstances and denied an intent to obstruct justice. An attorney associated with the defense testified in a challenge to the accuracy of the court reporter's transcription of one specification which attributed to respondent a vulgarity, referred to hereafter.

A proper evaluation of the charges required, in addition to consideration of the hearing testimony and an appraisal of the witnesses who testified thereat, a close study of the trial record to place in their proper perspective the acts and conduct which underlie the charges against respondent[13]—to recreate, to the extent possible, the living trial as it un-

5. *See* Frank v. United States, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969); Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); Cheff v. Schnackenberg, 384 U.S. 373, 380, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966); In re Dellinger, 461 F.2d 389, 397 (7th Cir. 1972).

6. Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).

7. Sacher v. United States, 343 U.S. 1, 14, 72 S.Ct. 451, 457, 96 L.Ed. 717 (1952). *See also* Offutt v. United States, 348 U.S. 11, 13, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

8. Referred to herein as Trial Record (T.R.). The transcript for the morning session of the first day of the trial was paginated separately from the rest of the transcript. Therefore, the transcript of that morning session will be cited as T.R. (A).

9. Referred to herein as Hearing Record (H. R.).

10. H.R. 10, 120. *Cf.* Fisher v. Pace, 336 U. S. 155, 161, 69 S.Ct. 425, 93 L.Ed. 569

(1949); United States v. Seale, 461 F.2d 345, 354 (7th Cir. 1972). *See also* Clark v. United States, 289 U.S. 1, 12, 53 S.Ct. 465, 468, 77 L.Ed. 993 (1933): "The petitioner blurs the picture when she splits her misconduct into parts, as if each were a separate wrong to be separately punished. What is punished is misconceived unless conceived of as a unit; the abuse of an official relation by concealment and deceit. Some of her acts or none of them may be punishable as crimes. The result is all one as to her responsibility here and now. She has trifled with the court of which she was a part, and made its processes a mockery. This is contempt, whatever it may be besides."

11. Judge Bonsal was available to testify, but he was not called as a witness.

12. *Cf.* Fisher v. Pace, 336 U.S. 155, 161, 69 S.Ct. 425, 93 L.Ed. 569 (1949).

13. *Cf.* Sacher v. United States, 343 U.S. 1, 32, 35, 72 S.Ct. 451, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting).

folded from day to day.[14] Thus, the Court has read the entire record of the trial of Stuart Cohen, almost 2,000 pages.

The indictment upon which Stuart Cohen was brought to trial was comparatively simple. It charged that he and another had made false material statements to a licensed gun dealer on three separate occasions in connection with the purchase of rifles, in violation of the Gun Control Act,[15] and that they, together with other named persons, had conspired to violate that Act.[16] The co-defendant had previously pled guilty and Stuart Cohen was the sole defendant on trial before Judge Bonsal.

The record indicates that from the very start of the trial, even before the jury was sworn, an atmosphere of tension was created. When the case was called for trial, in an obviously emotional argument, the respondent moved for dismissal of the indictment upon a claim that his client previously, on July 9, 1971, had entered a plea of guilty in the Eastern District of New York to a charge of conspiracy to possess and transport explosives (upon which he had received a suspended sentence) on a "distinct understanding" or "impression" of a promise by the prosecution that the plea would cover the instant charges, and expressed the view his client had "been betrayed."[17] The charge was denied by the prosecutor as without substance, noting that the instant indictment had been returned in August 1972, more than a year after the entry of the guilty plea in the Eastern District, and almost two years before the instant case was called for trial. Additionally, Judge Bonsal observed that pretrial conferences had been conducted in September and October 1972, and January and February 1973, and no such claim had ever been advanced on behalf of the defendant. He ordered the trial to proceed. The voir dire of the jurors was not without incident. Respondent's conduct required an admonition from the Court that he sit down—a direction that was necessary to repeat on a number of occasions on the opening day of trial, and may times thereafter.[18] Also on that first day, the trial judge cautioned respondent, "please don't keep making these speeches"[19]—an admonition which likewise it was necessary to repeat throughout the course of the trial.

Respondent, in his opening statement to the jury, sought to inject into the case obviously irrelevant matters,[20] which if permitted would have proliferated the issues under the indictment. Thus he addressed the jurors: "And Mr. Cohen does believe, as I believe and as many other Jews believe, that another holocaust may come and that we may have—." Upon objection by the prosecution, the Court urged upon defense counsel: "Don't get into that, please. You raised the issue of knowledge and intent, quite properly. But let's not get into other issues."[21] But as counsel continued with his opening argument, he disregarded the Court's request and again touched upon irrelevant matters. He then referred to the Jewish Defense League, a militant organization whose activities had come to public notice and of which the defendant was a member. The Court, in an effort to keep the trial within the framework of the indictment charges, noted: "This case does not involve that. This case purely involves the question of these guns, and whether there was a conspiracy to acquire these guns . . . . Let's keep to the is-

---

14. *Cf.* United States v. Johnson, 327 U.S. 106, 112, 66 S.Ct. 464, 90 L.Ed. 562 (1946); Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680 (1942). *See also* Sacher v. United States, 343 U.S. 1, 32, 72 S.Ct. 451, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting).

15. 18 U.S.C. § 922(a)(6) (1970).

16. 18 U.S.C. § 371 (1970).

17. T.R. (A) 2–3.

18. *See, e. g.,* T.R. (A) 28, 36, 63; T.R. 62, 117.

19. T.R. 62.

20. *Cf.* Fisher v. Pace, 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569 (1949).

21. T.R. 18.

sues of this case."[22] The Court previously had observed that the indictment was "very simple," charging the defendant "with having made false statements to get three rifles, with a conspiracy count thrown in . . .," which respondent challenged as "not that simple," and the Court continued, "It is going to be that simple."[23] At the end of the first day of trial, after the jury had been discharged, the following occurred:

> "MR. JAFFE [the Assistant United States Attorney]: . . . I would ask you to admonish defense counsel to stop making speeches on objections.

> "THE COURT: I have been doing my best. I will try to stop him. Please don't make speeches."

The Court thereupon admonished both defense and government counsel: "[S]top all this rhetoric and let's move along with the trial."[24] It is against the background of this charged atmosphere at the very start of the trial, which intensified over the following eleven trial days, that the respondent's acts and statements, set forth in the citation which is attached hereto,[25] must be considered.

Upon a careful word by word study of the trial transcript and an evaluation of the testimony and demeanor of the witnesses who testified at the hearing with respect to the circumstances attendant upon each specification, there emerges a clear pattern of persistent and repetitive tactics by respondent which obstructed and interfered with and delayed the orderly progress of the trial and hampered the trial judge in the performance of his judicial duties.[26] It would be a work of supererogation to detail the evidence and the circumstances surrounding each numbered specification. A number of instances will suffice.

■■ The first incident, while perhaps by itself not constituting contemptuous conduct, was a forecast of subsequent incidents enumerated in the citation which clearly come within the ban of proscribed conduct. Immediate events surrounding this incident establish that respondent shouted in making objections, used a strident tone and sarcastic language,[27] engaged in unnecessary argument and misstated the law.[28] After the jury was excused, the prosecutor appealed to the trial judge to "have the defense counsel stop misstating what the law is and misstating what I am doing." The Court thereupon said to respondent, "I do agree that it is unwise to make these speeches," and commented

---

22. T.R. 26.

23. T.R. (A) 20–21.

24. T.R. 71–71A. At the hearing respondent acknowledged that on occasion the Court "properly" admonished him and the prosecutor. H.R. 132.

25. In order to give background and context, additional portions of the trial record preceding the specific excerpts contained in Judge Bonsal's citation are included. H.R. 8. *Cf.* In re Dellinger, 461 F.2d 389, 397 (7th Cir. 1972). *See also* H.R. 135.

26. *Cf.* Illinois v. Allen, 397 U.S. 337, 343, 346–347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); In re McConnell, 370 U.S. 230, 235–236, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962); Sacher v. United States, 343 U.S. 1, 13–14, 72 S.Ct. 451, 96 L.Ed. 717 (1952); Fisher v. Pace, 336 U.S. 155, 162, 69 S.Ct. 425, 93 L.Ed. 569 (1949).

27. In noting respondent's manner of speech, bearing and attitude, the Court accepts the testimony of Judge Bonsal's clerk, and the findings of respondent's manner during such incidents are based thereon.

At the hearing respondent acknowledged when questioned: "I am at times loud. I am at times harsh. I am at times strident. I am at times sarcastic and difficult and contentious." H.R. 146.

It is also noted that the other defense witness, who was co-counsel with respondent and was present during the entire trial (with the exception of two morning sessions), was not questioned as to any occurrence, except to challenge the accuracy of the trial reporter's transcription under Specification 11. *Cf.* United States v. Di Re, 332 U.S. 581, 593, 68 S.Ct. 222, 92 L.Ed. 210 (1948); United States v. Conforti, 200 F.2d 365, 369 (7th Cir.), cert. denied, 345 U.S. 925, 73 S.Ct. 782, 97 L.Ed. 1356 (1953); United States v. Beekman, 155 F.2d 580 (2d Cir. 1946).

28. T.R. 115–120.

that the sidebar conferences were delaying the trial. The response of the respondent was, "I would ask that the Court at this time declare a mistrial and disqualify itself from sitting in this matter. I think that the Court throughout the inception of this proceeding has been grossly prejudicial and unfair and unheeding of the rights of the defendant —." [29] An objective study of the record indicates that there was not the slightest justification for this accusation of prejudice, unfairness or indifference to the rights of the defendant on trial. This was the forerunner of similar charges or motions for mistrial when the Court sought to impress upon respondent that his actions were obstructive and to have him desist therefrom.[30] The fact that the Court may have ruled adversely to respondent's contention by no means reflected a prejudicial attitude and did not warrant the motion for a mistrial.[31]

The second specification centers about the cross-examination by respondent of a government witness who admitted that her initial statements to official investigators as to the circumstances of the sale of firearms, the signing of the forms in connection therewith, and the persons involved as purchasers were not true. Upon the trial, contrary to an earlier identification of another person, she named the defendant as a purchaser of the firearms. She testified that her earlier false versions were given because she was frightened, since the sale of the weapons was made contrary to law and regulations.[32] Respondent's continued loud, harsh and strident questioning of this witness soon degenerated into a shouting contest between the two. She was adamant, however, that her trial testimony was truthful; also that she had been admonished by the prosecutor

to tell the truth at the trial.[33] Respondent made sarcastic, mocking and disrespectful comments about this latter aspect of her testimony. He also directed sarcastic remarks to the trial judge when he suggested that respondent, in examining the witness, not "get so excited." [34] Under respondent's repetitious questioning the witness reiterated she was giving truthful testimony, with the result that he shouted even more, with the witness being led to respond in kind until finally the Court admonished respondent "to please modulate your voice. This is not a shouting match, this is a trial, and the jury and I are interested in the facts, and it doesn't help to have you make such a loud noise in the courtroom," to which respondent sarcastically replied, "thank you, your Honor."

"THE COURT: Or to engage in arguments with the witness. Now please relax.

"MR. COHEN: I am angry, your Honor. I am very angry." [35]

As the witness, under continued badgering by respondent, insisted she was testifying truthfully, it was evident that respondent became angrier and even enraged. The Court was compelled to interrupt the trial for a sidebar conference, with the jury still in the box. The prosecutor then protested respondent's conduct as "outrageous," and the Court stated: "I have asked Mr. Cohen to stop this shouting and stop all this argumentation. It doesn't go in this court. It really doesn't." [36] Thereupon, as Judge Bonsal's clerk testified,[37] respondent raised his voice so that the jury could hear; in addition to accusing the government of interference with his cross-examination, the respondent expressed his view that the use of such a witness was "an outrage against every standard

29. Specification 1; T.R. 122.

30. T.R. 304, 765, 775.

31. *Cf.* United States v. Harris, 458 F.2d 670, 678 (5th Cir.), cert. denied, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972).

32. T.R. 248–252.

33. T.R. 278–79.

34. T.R. 279.

35. T.R. 281–82.

36. Specification 2; T.R. 284.

37. H.R. 32.

of decency and morality." [38] Finally, the Court said to respondent: "You don't improve your position by these antics and shouting in the courtroom, and I am not going to allow you to do it." [39]

Respondent resumed his cross-examination of the witness, which the record shows was not only hectoring, but repetitious and in disregard of the Court's admonition not to repeat previous questioning, until the Court again directed respondent to refrain, stating: "We went all through this yesterday afternoon," with respondent replying, "No, we did not, your Honor. We went through a portion of it." [40] The result was an event related to the third occurrence,[41] when respondent yelled at the witness: "You are not telling the truth now, Mrs. Brown." The Court reacted: "Please, now. Wait a minute. Please don't do that." Thereupon respondent turned from the witness and to the Court, and, as described by the prosecution witness, with his hands dropped to his sides in a gesture of resignation to suggest the Court was unfair to the defense and that it was useless to go forward, in the presence of the jury, stated: "Your Honor, if the Court wants counsel to stand mute, I'll be happy to." [42]

With respect to this same witness and the next specification,[43] the record demonstrates a repetitious, badgering cross-examination, in continued disregard, if not in defiance, of the Court's admonition, and conducted in such a loud voice that the Court again was forced to interrupt the trial and excuse the jury. The following then occurred:

"THE COURT [in addressing respondent]: . . . I would just like to say it is quite apparent to me you haven't been in the federal court very often, and perhaps you are not used to our procedures.

"MR. COHEN: I object to that comment, and I consider it—.

"THE COURT: You can object all you want, but I have been a Judge here for over eleven years, I have never held a lawyer in contempt, and s [sic] don't want to hold a lawyer in contempt.

"I have asked you any number of times to try to keep quiet, modulate your voice, not shout, because I don't think it is doing any good to anybody other than prolonging the trial. I have been trying to help you in every way I can,[44] and I obviously will continue to, but I am going to see that this trial is conducted as it should be, as a search for the truth, and a search for the truth depends on the testimony and the facts that are brought out and doesn't depend on the noise or the loudness of lawyers.

"I say that to you with great sincerity, and I hope that this is going to stop. It isn't your view as to whether a witness may be telling the truth or lying, you are entitled to cross-examine that witness, the conclusion on that is the jury's.

"I would also like to say I feel from what's gone on—here that you may be emotionally involved in this thing, and I ask you to think about that and try not to be because what we are trying to reach here is justice in this case and you are an officer of the Court and I am sure you are just as interested in that as I am." [45]

---

38. T.R. 285.

39. T.R. 286.

40. T.R. 300.

41. Specification 3.

42. T.R. 301.

43. Specification 4.

44. When defense counsel encountered difficulty in getting an answer from the witness, the Court's persistent questioning succeeded, which the respondent acknowledged. T.R. 294. There were similar incidents when the Court clarified matters for the defense. Indeed, the respondent acknowledged that the Court "was very helpful on other occasions, too." H.R. 151.

45. T.R. 302–04.

■ This fervent plea was answered by the respondent, after noting he had been a practicing member of the bar for over twenty years and argued hundreds of cases in the state and federal courts:

> " . . . I moved yesterday for the Court to disqualify itself and to declare a mistrial. I feel that the conduct of the Court in no manner whatsoever is remotely interested in justice or the discovery of the truth in this case." [46]

The respondent then made the frivolous and rather singular comment that the determination of the witness' credibility "is not for a jury decision" and continued in argumentative and obstructive colloquy.[47] Parenthetically, at the hearing respondent testified that he construed the trial judge's statement that he never held a lawyer in contempt and of his reluctance to do so as a threat to hold him in contempt. A fair reading of what transpired does not in the slightest justify that interpretation, nor even if so construed does it justify respondent's continued misconduct thereafter.

■ These are but several of the thirteen incidents set forth in the citation. The record abounds with other instances of unseemly and reprehensible conduct which repeatedly delayed the trial and interfered with its orderly progress. There were contumacious and disrespectful outbursts when respondent was displeased with the Court's rulings.[48] Thus, he addressed the Court:

"Come on, your Honor, this is ridiculous."[49] This came during respondent's questioning of the defendant on direct examination relative to testimony given against him by one of the government's main witnesses, an undercoveragent. The trial judge, at a sidebar conference, noted that he was "very concerned" about respondent's apparent lack of preparation.[50] When soon after this incident another sidebar conference was forced by another of respondent's outbursts and the Court urged him to "relax," reminding him "[y]ou are a lawyer in a courtroom," his response was: "I have been for many years, and I have never seen anything like this circus," and he continued the colloquy in a loud voice, requiring an admonition by the Court that respondent "keep [his] voice down."[51]

At another point, when respondent again vociferously objected to the cross-examination of his client, the Court directed him to sit down. He refused; he was openly defiant:

> "MR. COHEN: I have heard you ask me to sit down, your Honor.
>
> "THE COURT: I ask you again.
>
> "MR. COHEN: And I won't sit down; I will not tolerate this. This is a travesty."

His conduct before the jury required a recess, during which he again charged that what the Court permitted in the case was "ridiculous"; that the "Court's conduct in this trial makes it a travesty of justice."[52]

---

46. T.R. 304.

47. T.R. 305.

48. "[I]f . . . the misconduct serves . . . solely to vent the speaker's spleen, the requisite obstruction would be present." United States v. Seale, 461 F.2d 345, 370 (7th Cir. 1972).

49. Specification 8; T.R. 1352.

50. Immediately before this incident the trial judge's concern was manifested when he said to respondent: "I am [saying this] with the best faith in the world. But I have been watching the jury, and I think they are getting the impression by this turning over this transcript page by page that you are really

on a fishing expedition. I don't think it is going to help you. . . . I just mention it to you in good faith." T.R. 1344–45.

51. Specification 9; T.R. 1410. Soon after this incident, the trial judge also admonished the prosecutor that he did not "think it fair to spread in this courtroom a lot of talk about these things which he [defendant] denies he did," and directed the prosecutor to put his questions to defendant on cross-examination in a different frame of reference so as to avoid unfair implications. The respondent thanked the judge for the direction. T.R. 1411.

52. Specification 10; T.R. 1422–24.

On another occasion, in cross-examining a witness about an exhibit, the prosecutor suggested he show it to the witness, whereupon respondent said: "There is no point in showing it to the witness." The Court directed that he show it to the witness, to which the respondent flippantly answered: "I will be happy to. He can make paper airplanes out of it for all I care." [53]

No useful purpose would be served in detailing each and every particular contained in the citation, which show persistent open defiance and disrespect to the Court, often in the presence of the jury.[54] In sum, the respondent, throughout the trial, engaged in loud and boisterous conduct, repeatedly disregarded the orders of the Court, without justification frequently charged the trial judge with hostility and unfairness when rulings went against him, persisted in continued questioning of witnesses as to matters previously excluded by the Court, badgered a witness far beyond the limits of proper cross-examination, and carried on obstructive colloquies, causing repeated delays and interruptions of the trial. Furthermore, at one point, without excuse, he was twenty minutes late for a court session which previously had been scheduled specifically to accommodate him,[55] and soon thereafter he charged that the Court

had "sandbagged" him when it admonished him for having been late.[56]

 One of the specifications[57] includes the use of a scatological term by respondent when the trial judge requested him to sit down.[58] This specification presented the only issue of fact as to the trial transcript. I find upon a full consideration of the testimony given by the witnesses that the defendant did use the term and that the court reporter correctly transcribed respondent's utterance. If there is to be the reality of a fair trial, both in fact and in appearance, it must be conducted in an atmosphere of respect, order, decorum and dignity befitting its importance both to the prosecution and the defense.[59] In our tradition "a courthouse [is] a hallowed place of quiet dignity as far removed as possible from the emotions of the street";[60] the atmosphere that should pervade the trial is one of "hush and solemnity of a court of justice."[61] While an attorney is under a duty to represent his client with vigor and fidelity, this duty is not without its limits; it does not permit an attorney to misconduct himself in the pursuit of his client's interest.[62] Respondent's status as an officer of the Court is not to be overlooked;[63] as such he has a higher duty to assist in maintaining the dignity of the Court than the ordinary citizen.[64]

53. Specification 12; T.R. 1677A.

54. *Cf.* Illinois v. Allen, 397 U.S. 337, 346–347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); Cooke v. United States, 267 U.S. 517, 534, 45 S.Ct. 390, 69 L.Ed. 767 (1925).

55. Specification 5; T.R. 747–48. The record supports a further finding that in addition to this inexcusable nonappearance, the trial was delayed on more than 20 occasions, at times from 5 to 10 minutes, because of respondent's failure to appear at scheduled times when all other participants were on time. H.R. 42. *Cf.* In re Niblack, 155 U.S. App.D.C. 174, 476 F.2d 930 (1973).

56. Specification 6; T.R. 766.

57. Specification 11; T.R. 1626.

58. When the Court then observed it was "getting tired" of respondent's conduct, he replied "this is a farce."

59. Illinois v. Allen, 397 U.S. 337, 343, 90 S. Ct. 1057, 25 L.Ed.2d 353 (1970); *cf.* United

States v. Sacher, 182 F.2d 416, 454–455 (2d Cir. 1950) (Frank, J., concurring), aff'd, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952).

60. Mayberry v. Pennsylvania, 400 U.S. 455, 456, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971).

61. Sacher v. United States, 343 U.S. 1, 38, 72 S.Ct. 451, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting).

62. *Cf.* Sacher v. United States, 343 U.S. 1, 13–14, 72 S.Ct. 451, 96 L.Ed. 717 (1952).

63. *Cf.* Sacher v. United States, 343 U.S. 1, 26, 72 S.Ct. 451, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting); Clark v. United States, 289 U.S. 1, 12, 53 S.Ct. 465, 77 L.Ed. 993 (1933).

64. *See* Hallinan v. United States, 182 F.2d 880, 888 (9th Cir. 1950), cert. denied, 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375 (1951).

One may understand the use of certain language patterns and word choice among the illiterate and uneducated, but surely the lawyer may not descend to the use of gutter language to give vent to his disagreement with a court's ruling.[65] The duty of a lawyer to his client does not justify even in this age of permissiveness, if the dignity and decorum of a trial is to be preserved, the use of scatological terms by a lawyer to express his disagreement with a court's ruling.

The pattern of misbehavior was persisted in even after the Court, with almost infinite patience, as the record reveals, urged upon respondent that he desist therefrom and that he adhere to proper standards of trial conduct. The totality of his conduct, as evidenced by respondent's defiant disregard of the Court's repeated orders—which time and time again delayed the trial either because of compelled sidebar conferences or recesses to avoid prejudicial impact upon his client's cause—and his reckless indifference to his professional duty and for orderly judicial process compel a finding that his misbehavior was willful, was intended to and in fact did materially obstruct the orderly processes of the trial; it interfered with the proper discharge by the judge of his judicial function.[66]

The defendant's subjective denial of intent to obstruct, expressed at the hearing before me, meets a sharp challenge from the objective facts of his acts and statements at the trial; it would require a blatant disregard of the totality of evidence not to find that defendant's conduct was willful, deliberate and intentional. It has been stated that the requisite intent may be ascertained from a trial transcript.[67] Indeed, in this case it fairly leaps from the trial record and is sufficiently established even without the testimony of the prosecution witness at the hearing. This is not a case of an isolated instance of contemptuous conduct, a sudden outburst, which now and then does occur under the pressure of trial where one is carried away by misguided zeal in the defense of a client and which may be overlooked as aberrational. Nor is it a case where the defendant can advance with any degree of plausibility a claim that his acts and conduct were triggered by or in response to the acts or attitude of the trial judge. One searches in vain through the entire record to find a single such instance; the judge was not an "activist seeking combat."[68] To the contrary, here, after a series of incidents which resulted in compelled and repeated interruptions of the trial, the Court virtually beseeched the defendant to desist from his pattern of conduct. The trial judge was a model of self restraint and displayed Job-like patience;[69] in measured words and with calmness he sought to impress upon respondent that his conduct, if continued, was leading in the direction of a contempt charge which, with reluctance, he would have to consider.[70] But it was to no avail; instead, petitioner stubbornly persisted in his reprehensible and contumacious conduct.

It is one thing for counsel to strongly and persistently pursue a con-

65. *Cf.* United States v. Seale, 461 F.2d 345, 370 (7th Cir. 1972).

66. *Cf.* Illinois v. Allen, 397 U.S. 337, 343, 346–347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); In re McConnell, 370 U.S. 230, 234, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962); United States v. Seale, 461 F.2d 345, 369–371 (7th Cir. 1972); United States v. Sacher, 182 F. 2d 416, 420 (2d Cir. 1950), aff'd, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952).

67. *See* United States v. Seale, 461 F.2d 345, 369 (7th Cir. 1972). *See also* United States v. McCarthy, 196 F.2d 616, 619 (7th Cir. 1952); United States ex rel. Porter v. Kro-

ger Grocer & Baking Co., 163 F.2d 168, 177 (7th Cir. 1947).

68. Mayberry v. Pennsylvania, 400 U.S. 455, 465, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); *cf.* Offutt v. United States, 348 U.S. 11, 12, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

69. Toward the close of the trial respondent acknowledged "your Honor has been more than patient and more than tolerant of the exhaustive testimony in this case." T.R. 1644.

70. *Cf.* Mayberry v. Pennsylvania, 400 U.S. 455, 465, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); Illinois v. Allen, 397 U.S. 337, 347, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1970).

tention; it is quite another to continue in actions that debase the trial when warned to refrain from obstructive tactics. In the event the Court's rulings were erroneous, the rights of his client were amply protected by an appropriate appeal, which the Court specifically called to respondent's attention in a vain effort to have him desist.[71] That the Court made adverse rulings to the defense, even if counsel disagreed, did not justify contumacious behavior or disrespectful outbursts, or the repeated specious challenges to the Court's integrity, and the motions for mistrial on the ground that it was biased, prejudiced and unfair to the defense, a number of which were made in the presence of the jury.[72]

■■■ The proper conduct of the trial—that it go forward expeditiously with due regard for the rights and interests of the litigants—requires the maintenance of discipline in the courtroom. While under our adversary system counsel for litigants, prosecutors and defense attorneys alike, are expected to plead the cause of their clients with vigor and zeal, they are required to comport themselves so that they do not interfere with the integrity or efficiency of the trial process—indeed they are under an affirmative duty to further, not obstruct, the administration of justice. And when the conduct of an attorney causes unwarranted and frequent interruptions in the orderly and expeditious conduct of the trial, the end result is disruptive of the trial court's business so as to amount to an obstruction of jus-

tice. Here there was such a course of conduct by respondent from the very start to the end of the trial. When respondent in summation again adverted to the irrelevant and emotional matter which he sought to inject into the trial in his opening statement to the jury, the Court again urged respondent to keep within bounds; thereupon he abruptly terminated his summation and with a sarcastic and mocking manner asked: "Would your Honor like me to discuss a burlesque show or a rodeo or . . . ."[73] There can be little doubt that had Judge Bonsal, immediately upon the commission of several of the incidents cited, acted summarily pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure and held respondent in contempt, his judgment would have been beyond challenge.[74]

In sum, the evidence compels the conclusion that the government has established beyond a reasonable doubt the essential elements of the contempt charge, to wit:

(1) that the totality of the acts and conduct charged to respondent constituted misbehavior, committed in the presence and the hearing of the trial judge;

(2) that such misbehavior materially interfered with and delayed the orderly progress of the trial and further interfered with the trial judge in the discharge of his duties during the trial and resulted in the obstruction of justice;

(3) that such misbehavior was engaged in by respondent willfully, deliberately and with intent to obstruct the administration of justice.[75] According-

---

71. T.R. 765. *See* United States v. Sacher, 182 F.2d 416, 430, 454 (2d Cir. 1950), aff'd, 343 U.S. 1, 9, 72 S.Ct. 451, 96 L.Ed. 717 (1952) ; In re Dellinger, 461 F.2d 389, 398–399 (7th Cir. 1972) ; Hallinan v. United States, 182 F.2d 880, 885 (9th Cir. 1950), cert. denied, 341 U.S. 952, 71 S.Ct. 1010, 95 L.Ed. 1375 (1951).

72. *Cf.* Ex parte American Steel Barrel Co., 230 U.S. 35, 43–44, 33 S.Ct. 1007, 57 L.Ed. 1379 (1913) ; United States v. Amick, 439 F.2d 351, 369 (7th Cir.), cert. denied, 404 U.S. 823, 92 S.Ct. 47, 30 L.Ed.2d 51 (1971) ; United States v. Anderson, 433 F.2d 856, 860 (8th Cir. 1970) ; Rosen v. Sugarman,

357 F.2d 794, 798 (2d Cir. 1966) ; Martin v. United States, 285 U.S. 150, 151 (10th Cir. 1960), cert. denied, 365 U.S. 853, 81 S.Ct. 818, 5 L.Ed.2d 816 (1961). *See also* Sacher v. United States, 343 U.S. 1, 9, 72 S.Ct. 451, 96 L.Ed. 717 (1952).

73. Specification 13 ; T.R. 1765.

74. Sacher v. United States, 343 U.S. 1, 72 S. Ct. 451, 96 L.Ed. 717 (1952) ; Ungar v. Sarafite, 376 U.S. 575, 584–585, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).

75. United States v. Seale, 461 F.2d 345, 366–367 (7th Cir. 1972) ; In re Dellinger, 461 F.2d 389, 400 (7th Cir. 1972).

ly, respondent is found guilty as charged.

The foregoing shall constitute the Court's Findings of Fact.

## APPENDIX

### PORTION OF RECORD PRECEDING SPECIFICATION OR PARTICULAR 1[1] (T.R. 115–21)

MR. COHEN: I object to this entire proceeding and I want the record to reflect that objection. However, if the Court will allow the use of this material, again I request that this exhibit be introduced in evidence.

THE COURT: Do you have any objection to that?

MR. JAFFE: None at all.

THE COURT: All right.

MR. COHEN: And before the reporter leaves, your Honor, I would also, while we are at the side bar, ask that the exhibits which are introduced into evidence, and which speak for themselves, not be read to the jury with the dramatic and deleterious impact—

MR. JAFFE: I didn't think I was being dramatic.

THE COURT: That applies to both of you. That can apply to you too. The jury requires a modulated voice.

MR. COHEN: There is no reason or excuse for that.

THE COURT: Okay.

(In open court)

MR. JAFFE: The Government at the defendant's request offers Government Exhibit 11E.

THE COURT: All right.

(Government Exhibit 11E for identification was received in evidence).

MR. JAFFE: Ladies and gentlemen, I am going to read from Exhibit 11E: "Ammo 108. September 6, 19"—

MR. COHEN: I object to the reading of this document, which speaks for itself.

THE COURT: Let him read it.

All right. Go ahead and read the document, but read it as it is written.

MR. JAFFE: "1. On Monday, August 31, 1970, the assigned left his residence at 5:15 a. m.

"3. Mr. Stuey Cohen and the assigned went to Dau-Son's Sporting Goods in Woodbourne, New York, where the assigned observed Mr. Dave Brown and John, last name unknown, an ammunition salesman. Mr. Brown asked John if John could get 200 pounds of unregistered black powder for a good cause. John stated he would have to look around. Mr. Brown stated he would have the 20 gauge sawed off shotgun ready by Thursday, September 3, 1970. Mr. Cohen purchased the two boxes of 38 special ammunition, which Mr. Brown put down as mops on the bill."

Q Mr. Brown, does that refresh your recollection?

A Yes, it does.

Q Do you recall now having a conversation with Mr. Cohen on Monday, the 31st of August?

A That's correct.

Q Tell these ladies and gentlemen, if you would, who else was present.

A Stuey Cohen, John and—

THE COURT: Who is John?

THE WITNESS: John is a salesman.

THE COURT: Your salesman?

THE WITNESS: Yes.

THE COURT: What is his last name?

THE WITNESS: I don't know his last name.

Q Do you recall if Mr. Rosenthal was present?

A Mr. Rosenthal was present.

MR. COHEN: Your Honor, I object to that. Why doesn't the—

THE COURT: Please, now. Sit down.

MR. COHEN: Your Honor, no, no, no "please, now." This is ridiculous for the United States Attorney to testify

1. See n. 25 supra.

and to put words in the mouth of the witness.

THE COURT: Okay. All right. Please don't do that. Ask the witness what happened.

Q Mr. Brown, what did you say and what did each of the people there say?

A I said to him—I said to—I asked John if he could get me the powder, and he said it would be pretty—very hard to get. And at the time I had no intentions of getting it for him. I was just stringing him along because I just wanted their business. But he never got no black powder from me.

And also Stuey says—"You know," he says, "I wouldn't like to get the powder here." I says, "We can meet some place and I can give it to you."

But he never got the powder.

Q Did you ever sell black powder to Stuart Cohen?

A Never.

Q Did you ever sell black powder to anybody at the camp?

A Never. I never had it in my store. I've always had smokeless powder. Never.

Q You heard Exhibit 11E, is that correct?

A That's correct.

Q Did you sell any ammunition on that day?

A On that particular day?

Q That's right.

A I don't recall. I might have, but I don't recall.

Q Did you have any conversation with reference to shotguns?

A Yes. This I had.

Q Would you tell us what you said and what anybody else said, telling us who the other people are who were talking?

A I was talking to Stuey Cohen. He wanted me to cut the shotgun down. He wanted something like 18 inches. And I said to him that I would make it legal, and he said all right, he'll go along with it.

Q Did he give you a shotgun to have cut down?

A Yes, he did.

Q And what kind of weapon was it?

A I believe it was a single barrel, single shot shotgun.

Q And what did you do with that weapon?

A I didn't have the time to cut it down at the time, so I sent it out to Mr. Hartman in Livingston Manor.

Q Who is he?

A He is a gunsmith, too.

Q And did there come a time after that when you received the gun back?

A Yes, I did.

Q And thereafter did you give it to anybody?

A I gave it to Stuey Cohen. And Mr. Rosenthal, I believe, was present when I gave it to him. I'm not sure, but I believe he was there.

Q And did he pay you for the job?

A Yes, he did.

Q And to your knowledge was the gun at that time of a legal length?

A Yes, it was, definitely.

Q Now, you just said, I think your testimony was, that you were stringing him along because you wanted business?

A That's correct.

Q Would you explain.

MR. COHEN: Your Honor, I object. This is direct examination. He is not rehabilitating his witness.

MR. JAFFE: I am not trying to.

THE COURT: I don't think he needs any explanation anyway.

I think you testified that you wanted business.

THE WITNESS: That's correct.

THE COURT: And therefore you engaged in conversation about these things, but you said you had no intentions of ever giving him the black powder.

THE WITNESS: No intentions, and he never got it from me.

THE COURT: Okay.

Q Did Mr. Cohen pay you for the work done on that shotgun?

A Yes, he did.

Q Do you recall how much?

A I don't recall.

MR. JAFFE: May I have just a moment, your Honor?

(Pause)

MR. JAFFE: Judge, s [sic] have nothing further.

THE COURT: All right. We'll take our morning recess, ladies and gentlemen.

(The jury left the courtroom.)

MR. JAFFE: May I be heard, Judge?

THE COURT: I want to first check on the 3500 material.

MR. JAFFE: That was furnished yesterday, your Honor.

THE COURT: You have received that?

MR. COHEN: I have an application.

THE COURT: Well, go ahead.

## SPECIFICATION OR PARTICULAR 1 (T.R. 122)

MR. JAFFE: My application, your Honor, is to have the defense counsel stop misstating what the law is and misstating what I am doing.

THE COURT: I think what I am going to do on it, I do agree that it is unwise to make these speeches. Any time you want to make one of these speeches, we will go to the side bar.

MR. COHEN: I'll be happy to, your Honor.

THE COURT: But I think it delays the trial and I am not sure that it is really very effective otherwise.

Now what is your application?

MR. COHEN: Well, your Honor, with all due respect to the Court, I would ask that the Court at this time declare a mistrial and disqualify itself from sitting in this matter. I think that the Court throughout the inception of this proceeding has been grossly prejudicial and unfair and unheeding of the rights of the defendant—

THE COURT: All right.

MR. COHEN: —that every time defense counsel raises a valid legal objection, the Court waives its hands to sit down.

THE COURT: Your motion is denied.

## PORTION OF RECORD PRECEDING SPECIFICATION OR PARTICULAR 2 (T.R. 281–84)

THE COURT: I am going to ask you to please modulate your voice. This is not a shouting match, this is a trial, and the jury and I are interested in the facts, and it doesn't help to have you make such a loud noise in a courtroom.

MR. COHEN: Thank you, your Honor.

THE COURT: Or to engage in arguments with the witness. Now please relax.

MR. COHEN: I am angry, your Honor. I am very angry.

THE COURT: All right.

Mrs. Brown, as I understood it, you said yesterday that you did make some false statements to the agents and that when you saw Mr. Jaffe you were telling the truth, and he asked you why did you decide to change your mind and he suggested that it was on account of your license.

THE WITNESS: No, it was not.

THE COURT: All right.

THE WITNESS: My license was never, never discussed, never threatened by anyone.

Q Then why were you afraid? You testified yesterday—

A Because I knew I would have to tell the truth, and that's about it. I can't answer it any further.

THE COURT: Wait a minute. Mrs. Brown, wait a minute. You keep calm too. I am trying to keep both of you calm. That's what the jury and I want. Just keep quiet and relax.

What do you say, again?

THE WITNESS: I said I just knew I would have to tell the truth.

THE COURT: Okay.

Q And you were afraid.

A At this point I was not afraid. I just knew I would have to tell the truth.

Q What were you afraid of in December and in March, Mrs. Brown?

A I think I was more afraid of my husband than anything else, because he had no idea that I had given those papers out until later on, and I knew he would be furious.

Q Did you ever ask Stuart Cohen how old he was?

A Yes. He said 19.

Q And did you ever ask him to produce identification and verification of his age?

A I believe I did not.

Q Well, do you believe or do you know that you did not?

A I—I don't think so.

Q Did you or did you not?

A I don't think so. I don't recall.

MR. COHEN: May I ask access to the material that was introduced into evidence yesterday by the prosecution, the exhibits that were given to Madam Forelady, which I believe are in the custody of Mr. Jaffe?

MR. JAFFE: Excuse me, your Honor. May we approach the Bench?

THE COURT: Let's not have all this conversation. I remember the exhibits that were shown to the jury yesterday. Show them to Mr. Cohen.

(At the side bar)

MR. JAFFE: Your Honor, I have a standing objection, as your Honor is aware, to these type of tactics and this type of screaming—

SPECIFICATION OR PARTICULAR
2 (T.R. 284–87)

THE COURT: I know.

MR. JAFFE: And I object strenuously to Mr. Cohen making constant speeches before this jury, and I would ask the Court to strictly admonish to either get into the rules of this Court and adhere to the rules of this Court or else suffer the consequences of that, because his conduct in this case, and the way he is carrying on, is just outrageous and makes the government suffer in front of the jury.

THE COURT: Well, I'm not sure of that. But I have asked Mr. Cohen to stop this shouting and stop all this argumentation. It doesn't go in this court. It really doesn't.

MR. COHEN: Excuse me, your Honor. May I respond to that?

THE COURT: Well—

MR. COHEN: Or am I not allowed to respond?

THE COURT: I have given you plenty of chance to respond, but I don't think you need to respond right now.

MR. COHEN: I need not respond right now?

THE COURT: No.

MR. COHEN: I would like to respond and I would like to have it on the record. I have been stopped from entering matters on the record previously.

THE COURT: All right.

MR. COHEN: I have raised objections which I have not even been heard at side bar conferences.

THE COURT: You have been—

MR. COHEN: I would like to state on the record that the government's use—

MR. JAFFE: If you say it any louder, sir—

THE COURT: Please now. Both of you are getting too involved, and I don't like it.

MR. COHEN: I think that the use of a witness such as this is an outrage against every standard of decency and morality.

THE COURT: Oh, now, please.

MR. COHEN: And I think that the government has absolutely no right whatsoever to interfere with my most voluminous, extensive probing and

cross-examination to show this woman for the liar and cheat that she is.

THE COURT: I know. But you don't include the opposition, Mr. Cohen, and I am very serious about that. You don't improve your position by these antics and shouting in the courtroom, and I am not going to allow you to do it.

MR. COHEN: Judge, you have a woman here who has admitted in open court that she implicated an innocent person, Blumenthal.

MR. JAFFE: She did no such thing, and we'll bring that out.

THE COURT: Let's stop this right now.

MR. COHEN: She did not identify Blumenthal.

THE COURT: Let's stop that right now.

MR. JAFFE: Those are the exhibits that were given to the jury.

THE COURT: All right. You have the exhibit. Now let's go ahead.

MR. COHEN: I want—

THE COURT: Let's go ahead, please.

MR. COHEN: I want one brief sentence on the record. I would say to Mr. Jaffe what Mr. Welch said to Mr. McCarthy: "At long last, sir, is there no decency?"

THE COURT: Oh, please, now, just relax.

## PORTION OF RECORD PRECEDING SPECIFICATION OR PARTICULAR 3 (T.R. 300–01)

BY MR. COHEN:

Q Mrs. Brown, you testified yesterday that there came a time when you sold and delivered to Mr. Stuart Cohen three rifles, is that correct?

A Right.

Q With reference to the same weapons, was there a time when you stated that you sold any or all of those weapons to any other individual?

A If you are talking about the forms? Is that in reference to forms?

Q I'm talking to you about anything from the time of the creation of the world to this moment—

THE COURT: Please don't get into that.

Q —when you may have said that you sold those weapons to someone else.

THE COURT: We went all through this yesterday afternoon.

MR. COHEN: No, we did not, your Honor. We went through a portion of it.

THE COURT: Is the question whether at any time Mrs. Brown said other than these affidavits—which he discussed with you yesterday—do you remember that? Did you say to anybody that you sold these rifles to anybody else?

THE WITNESS: Only what I had on the forms.

THE COURT: Other than you had on the forms.

THE WITNESS: Right.

THE COURT: Is that what you said?

## SPECIFICATION OR PARTICULAR 3 (T.R. 301)

Q You are not telling the truth now, Mrs. Brown.

THE COURT: Please now. Wait a minute. Please don't do that.

MR. COHEN: Your Honor, if the Court wants counsel to stand mute, I'll be happy to.

THE COURT: Please don't make such statements, Mr. Cohen. Really.

MR. COHEN: We have a witness, your Honor, who has—

THE COURT: No, no, no, no. Now, please.

## PORTION OF RECORD PRECEDING SPECIFICATION OR PARTICULAR 4 (T.R. 302–03)

Q Madam, will you answer my question?

THE COURT: She is trying to answer your question, Mr. Cohen, and please keep your voice down.

**1182**

MR. COHEN: Your Honor, may I ask that the Court instruct the witness to answer my question. The question calls for a yes or no answer.

THE COURT: Wait a minute. We will take a short recess, ladies and gentlemen.

You are excused.

(Jury excused.)

THE COURT: Mr. Cohen, I would just like to say it is quite apparent to me you haven't been in the federal court very often, and perhaps you are not used to our procedures.

MR. COHEN: I object to that comment, and I consider it—

### SPECIFICATION OR PARTICULAR 4 (T.R. 303–08)

THE COURT: You can object all you want, but I have been a Judge here for over eleven years, I have never held a lawyer in contempt, and s [sic] don't want to hold a lawyer in contempt.

I have asked you any number of times to try to keep quiet, modulate your voice, not shout, because I don't think it is doing any good to anybody other than prolonging the trial. I have been trying to help you in every way I can, and I obviously will continue to, but I am going to see that this trial is conducted as it should be, as a search for the truth, and a search for the truth depends on the testimony and the facts that are brought out and doesn't depend on the noise or the loudness of lawyers.

I say that to you with great sincerity, and I hope that this is going to stop. It isn't your view as to whether a witness may be telling the truth or lying, you are entitled to cross examine that witness, the conclusion on that is the jury's.

I would also like to say I feel from what's gone on here that you may be emotionally involved in this thing, and I ask you to think bout [sic] that and try not to be because what we are trying to reach here is justice in this case and you are an officer of the Court and I am sure you are just as interested in that as I am.

We will take a short recess.

MR. COHEN: May I respond on the record to the Court's admonition, your Honor?

THE COURT: You can respond, surely.

MR. COHEN: May I state most respectfully, your Honor, for the record, that I have been a practicing member of the bar for over twenty years, and that I have argued hundreds of cases in the state and federal courts.

And may I say, your Honor, that I moved yesterday for the Court to disqualify itself and to declare a mistrial. I feel that the conduct of the Court in no manner whatsoever is remotely interested in justice or the discovery of the truth in this case.

THE COURT: Mr. Cohen—

MR. COHEN: I am making a record, if I may, your Honor.

As an officer of the Court I do command a certain amount of respect. I ask that I be allowed to be heard.

You have a government witness who admits on the stand that she has twice perjured herself, who by her own sworn statement falsely accuses an innocent individual—

THE COURT: That's why I say that is a jury decision, and you have brought out—

MR. COHEN: No, that is not for a jury decision, your Honor. You heard the testimony of the witness that she lied. You heard it as well as I heard it. And you have a twice-admitted perjurer and a fingerer and an identifier of innocent people, and you will not allow me to properly cross examine her.

I object to that.

THE COURT: I made my statement, Mr. Cohen, and I hope that no problems will arise in the future. But I ask you,

as I have asked you before, to remember that it isn't your view as to what the jury believes or my view on what the jury believes; the jury has that decision.

You have brought out the witness did make false statements in that affidavit. You have brought that out.

MR. COHEN: That is not enough.

THE COURT: In your opinion, it isn't enough.

MR. COHEN: I have a right to go into every aspect of her accusation of Blumenthal, which was a false accusation, a false identification, which could have led to the prosecution and incarceration of a totally innocent victim.

Are you telling me that I am wrong, your Honor, that I don't have that right? I would like to have it on the record.

THE COURT: That is not the issue before me, Mr. Cohen.

MR. COHEN: This is what I am cross examining her about.

THE COURT: What did you have to say, Mr. Jaffe?

MR. JAFFE: Your Honor, my statement is that I don't think that the Court, and surely not the government, have taken any steps to block any type of proper cross examination of this witness. We have provided the material, we have provided the statements where she lied, and there's no question, she said it from the stand, that she lied. And I don't think the government or the Court objects to any type of proper cross examination, but the examination that has been conducted thus far by Mr. Cohen is not a proper examination.

MR. COHEN: May I ask—

MR. JAFFE: May I complete my statement?

MR. COHEN: May I ask for one improper question asked by the defense?

THE COURT: Wait a minute.

MR. JAFFE: Your Honor, the constant references—let me start from the beginning:

The tone of the voice, the tactics, the screaming, the speeches to the jury, the failure to state a question but to just carry on in front of a jury in a loud voice, to be argumentative, and everything else which is clear on the record, is absolutely improper under the practice of this Court that I have seen for four years, and I believe that is what the Court admonished Mr. Cohen about, and that is what the government constantly objects to, and we have asked and constantly repeated our request Mr. Cohen be instructed to properly inquire of this witness.

We feel our case is being prejudiced by his not adhering to the Court's admonition.

MR. COHEN: May I ask—

THE COURT: Let's not go into any more conversations. I have made my admonition, Mr. Cohen, and made it in good faith. As I say, I have been a Judge here for eleven years, and I have never had this problem before, I can tell you that very frankly, and I hope that you don't get too emotionally involved in this thing because I don't think it is good for your client, and I don't think it helps in any case to get emotionally involved in these things, or to make loud statements to a jury, or to engage in argument with a witness.

I have said that, and I ask you—I am saying it with the best faith in the world, and I hope you will adhere to that.

We will take a few minutes recess.

PORTION OF RECORD PRECEDING SPECIFICATION OR PARTICULAR 5 (T.R. 737–38)

THE COURT: All right, ladies and gentlemen. This will be a good time to take our luncheon recess, and let's resume at ten minutes to two. That will give you an hour and a quarter.

I mentioned to you that in view of the Sabbath for some of the participants we will be adjourning earlier this afternoon. But let's meet again at ten minutes to two.

## SPECIFICATION OR PARTICULAR 5 (T.R. 747–48)

THE COURT: Gentlemen, I wanted to say for the record that the trial was to resume at 1:50 o'clock and I came out in the courtroom and Mr. Cohen had not arrived and I asked Mr. Zweibon if he would check, I asked the defendant, and it is now 2:05 and he hasn't arrived. I would like to put that on the record.

And also I indicated that my purpose in trying to get an early start this afternoon was out of deference to Mr. Cohen's request to observe the Sabbath, that he wanted to be home at sundown and that's why I wanted to get started as soon as possible. I would like all that on the record.

It is now five minutes past 2 and Mr. Cohen is not here.

Do you have anything to add to that, Mr. Zweibon?

MR. ZWEIBON: I cannot quarrel with your Honor's perception.

THE COURT: All right.

(Pause)

MR. ZWEIBON: Your Honor, I would, however, like the record also to indicate that the defendant Cohen is in court and has been in court.

THE COURT: That's right. That's fair enough.

(Pause)

THE COURT: Mr. Cohen, we were to resume at ten minutes to 2. What happened to you?

MR. COHEN: I am sorry. I thought it was ten after 2.

THE COURT: Nobody else did. Including the defendant was here on time. I don't know where you reached that understanding.

MR. COHEN: I am awfully sorry, your Honor.

THE COURT: I will consider this matter at the end of the trial, because we are wasting a lot of time. I don't think there is any excuse for it.

All right, bring the jury in.

## SPECIFICATION OR PARTICULAR 6 (T.R. 764–66)

BY MR. COHEN:

Q You stated previously, did you not, that you felt that you were a well-integrated member of the JDL—

THE COURT: He didn't use that word. Let's not reframe it. He said he became an active member by May. You thought you were an active member by then?

THE WITNESS: Yes, sir.

MR. COHEN: May I ask the reporter to reread the testimony, your Honor, so that we will know exactly what he said?

THE COURT: No, we will keep on. This happened five minutes ago. Go ahead with your questions, please.

Q You stated, did you not, that by May of 1970 you had been an accepted member or an integrated member or—

THE COURT: The testimony speaks for itself and the jury remembers it.

MR. COHEN: I am trying to lay the basis for a question.

THE COURT: Ask the question, please.

MR. COHEN: Your Honor, at this time I would ask that the jury be excused, if I may, and that we have a conference in chambers.

THE COURT: I will see you at the side bar.

(At the side bar.)

MR. COHEN: Your Honor, at this time the defense will again move that his Honor disqualify himself—

THE COURT: Your motion is denied. You have an exception.

MR. COHEN: —and declare a mistrial.

Would your Honor allow me to put on the record the fact that I had the prom-

ise of the Court that I be allowed two to three hours before beginning to cross examine Mr. Rosenthal.

THE COURT: You had all last night.

MR. COHEN: I did not.

THE COURT: You did, and I told you that. And now, please—

MR. COHEN: I reviewed Mr. Rosenthal's testimony to the best that I could last night. I could not review his testimony for three or four hours this morning and the tapes. I had exactly no time, unless I wanted to do without lunch. I walked in here and was sandbagged by this Court.

THE COURT: Because you did not observe my instructions to be here on time.

MR. COHEN: I did not observe your instructions. Because I was 20 minutes late your Honor made the threat to me to see me after the trial.

THE COURT: I did.

MR. COHEN: Fine. And your Honor has no recollection of promising me that I would have two to three hours?

THE COURT: I told you yesterday afternoon that the government said they would not be on for more than an hour today, and that you therefore had plenty of time with respect to the first part of the cross examination—the first part of the direct examination to prepare for the cross.

MR. COHEN: I did prepare, to the best that I could, and he was certainly on for a lot longer than an hour and I had no time to prepare.

THE COURT: You had last evening, and go ahead with your question.

SPECIFICATION OR PARTICULAR
7 (T.R. 774–75)

MR. JAFFE: We were specifically requested not to put in bombing. If he wants to put in bombing, well—

MR. COHEN: This is the exhibit. There is no—

THE COURT: Let's be consistent on this thing, Mr. Cohen. You elucidated or brought out that the reason he made the recording was because they were thinking about bombing some place, but I wouldn't pursue that.

MR. COHEN: I would, your Honor. If I were a police officer making a recording about bombing, or concerned with bombing, I would have asked one question at least, or made one reference to bombing, and I want to tell you, your Honor, I really think that the Court should hold me in contempt now because I don't know if I can continue with this trial, I really don't. I really feel that your Honor is so prejudicial to any honest advocate practicing before him this is totally impossible, I am reduced and frustrated at every turn, the Court is totally committed to the prosecution's viewpoint.

THE COURT: I know you think that, but that is quite untrue. I have been making every effort to be absolutely fair with you.

PORTION OF RECORD PRECEDING
SPECIFICATION OR PARTIC-
ULAR 8 (T.R. 1344–45, 1348–49)

THE COURT: I would just like to say one thing while you are here, Mr. Cohen. I am doing it with the best faith in the world. But I have been watching the jury, and I think they are getting the impression by this turning over this transcript page by page that you are really on a fishing expedition.

I don't think it is going to help you.

MR. COHEN: I am not on a fishing expedition. I am leaving over everything I can.

THE COURT: It is the process of reading these things.

MR. COHEN: I can't help that. I left out everything except that which is particularly relevant.

THE COURT: I just mention it to you in good faith.

MR. JAFFE: I want to make a standing objection to the constant leading of this witness. I have no objection to directing the witness' attention to an

event, but when he has a recollection of the event—

THE COURT: That is what ought to be done. That is really the way you ought to do it.

MR. COHEN: Okay.

THE COURT: I do mention that in absolute good faith to you.

. . . . . .

MR. JAFFE: I will object to this. Beginning on page 1241 of yesterday's examination he went all through it.

THE COURT: Yes. I don't know why you are doing it again. You went all through it, Mr. Cohen. I am going to sustain the government's objection. You went through both of these.

MR. COHEN: Again, your Honor, all I can do is call the exhibits and testimony to the attention of the Court. There is compelling reason for this.

THE COURT: Come to the side bar.

(At the side bar.)

SPECIFICATION OR PARTICULAR
8 (T.R. 1349–52)

THE COURT: I want Mr. Zweibon to hear this. This is what is troubling me. You are giving the impression here of coming in completely unprepared in the direct examination of your own client, and I think that is most unfortunate.

You went through these tapes yesterday. You went through them completely. This morning you have just been turning over pages of the transcript.

MR. COHEN: How else does one get from one page to another in a transcript, your Honor, without turning over?

THE COURT: One way you would get to it is if you had—and you say you talked to your client last evening, and you heard Mr. Rosenthal's testimony—is to pick the points which you think are important and ask him about that.

MR. COHEN: I am doing that.

THE COURT: You are not, and it is a bad show.

Now, what is new about the tape you didn't cover?

MR. COHEN: Here's what's new about the tape, and there is nothing new about the tape, the tape was totally covered, but the testimony has not been totally covered. The testimony has not been totally covered. The Court knows very well that you held me in very close rein as to the cross examination of this witness.

THE COURT: Of what witness?

MR. COHEN: Of Richard Rosenthal.

MR. JAFFE: That's outrageous.

THE COURT: I certainly did not, Mr. Cohen.

MR. COHEN: The record reflects that I concluded my cross examination with the understanding that I had no further questions at this time, and I have—

THE COURT: Let's not go through this. Will you please not go through this again, Mr. Cohen?

MR. COHEN: Is there anything we may go through? Is there anything we may go through?

THE COURT: I have been asking you—

MR. COHEN: Here is a direct contradiction.

THE COURT: What are you referring to?

MR. COHEN: Here he says on tape he left the thing here the whole day fully loaded. Here in his testimony he says Stuey wanted to know where his pistol was, and I pointed to a drawer.

So here he is saying he left the thing there all day—

THE COURT: You can—

MR. COHEN: Wait a minute, Judge; just one minute, darn it.

He is saying here Stuey left his pistol in a drawer all day, and here he is testifying that Stuey came in and asked him where the pistol was.

MR. JAFFE: What is the difference?

THE COURT: What more do you want?

MR. COHEN: I want Stuey's comment on this. He has a right to answer this.

MR. JAFFE: Then ask him the question of what he knows.

THE COURT: If I were you you can say on your summation how good a liar Rosenthal was, and you bring this out. It's a lot better than your asking Stuey questions.

MR. COHEN: I am sure your Honor will charge the jury that my summation is not evidence. This is evidence. There is a difference, and your Honor well knows it.

THE COURT: I have made my remarks on this, and I am really very concerned about it, Mr. Cohen, and if you wanted to go through this transcript yesterday that was the time to take this on. The trouble is it is so disorganized that I am very concerned with it.

MR. COHEN: There is no point in further discussion.

MR. JAFFE: Judge, just so the record is clear, and I know it is clear from what the Court said, if he wants to ask the witness what happened—

THE COURT: That's right.

MR. JAFFE: There is no objection to that, and the Court hasn't restricted that in any way.

THE COURT: That's right.

MR. COHEN: I have answered that on the record, too. That is pretty dishonest, to say to me—

THE COURT: Wait a minute.

MR. COHEN: —to say to me I have the right to ask the witness what happened when these events cover a period of a year and a half and the kid doesn't know what happened on what date. I didn't have weeks and weeks to prepare him.

THE COURT: No, but you heard this testimony.

MR. COHEN: Come on, your Honor, this is ridiculous.

SPECIFICATION OR PARTICULAR
9 (T.R. 1409–11)

[BY MR. JAFFE]:

Q Mr. Cohen, do you recall going from the apartment and talking to Sheldon Siegel about where to place the bombs you made on April 22?

MR. COHEN: Objection, your Honor. This is absolutely intolerable.

THE COURT: Mr. Cohen—

MR. COHEN: That the prosecutor is accusing him of bombings that are totally unrelated to this case.

THE COURT: Come up to the side bar.

(At side bar.)

MR. COHEN: Your Honor, this is unbelievable.

THE COURT: I told you to relax.

MR. COHEN: How can I relax?

THE COURT: Because I told you to. You are a lawyer in a courtroom.

MR. COHEN: I have been for many years, and I have never seen anything like this circus.

THE COURT: Stop that. What are you trying to bring out here, Mr. Jaffe?

MR. JAFFE: Your Honor, the defendant stated unequivocally that he never made anything, never did anything, had no recollection.

THE COURT: I know.

MR. JAFFE: His implication in the Amtorg case is overwhelming.

MR. COHEN: You are not trying that case here.

THE COURT: Keep your voice down.

MR. COHEN: You are not trying the Amtorg case, damn it.

THE COURT: Now listen, Mr. Cohen. I have had quite a lot of this.

The point is that he makes these answers and says he knows nothing or he had nothing to do with these things; and if you are going to bring on a witness on rebuttal to prove these things, you can go ahead and do it. But I don't

think it is fair to spread in this courtroom a lot of talk about these things which he denies he did. I would like you to couch your questions in a way that does not make it quite as an accusation as this might indicate. That is my point on this thing.

MR. JAFFE: Very well, Judge.

THE COURT: Which I think is the only way you can do it.

MR. COHEN: Thank you, Judge.

### PORTION OF RECORD PRECEDING SPECIFICATION OR PARTICULAR 10 (T.R. 1422)

[BY MR. JAFFE]:

Q Mr. Cohen, did you ever go to what is known as the PLO office?

MR. COHEN: Your Honor, I will object. Again these questions about other bombing incidents—

THE COURT: Wait.

### SPECIFICATION OR PARTICULAR 10 (T.R. 1422–24)

MR. COHEN: Your Honor, the Court should admonish the United States Attorney and instruct him not to ask these questions.

THE COURT: Mr. Cohen, I have asked you to sit down.

MR. COHEN: I have heard you ask me to sit down, your Honor.

THE COURT: I ask you again.

MR. COHEN: And I won't sit down; I will not tolerate this. This is a travesty.

THE COURT: Wait a minute.

Ladies and gentlemen, we will take a short recess.

(Jury excused.)

(In open court. Jury not present.)

THE COURT: Mr. Cohen, I have asked you a number of times, and you have paid no attention to me, and I must say that I am keeping track of these incidents and will consider them at the end of the trial, but I have asked you please not to do this because it doesn't help at all.

I would be interested to know what is the PLO. What does it refer to?

MR. JAFFE: The question was not whether he bombed it. I didn't bring that out. Mr. Cohen did.

MR. COHEN: PLO was bombed, Hurok was bombed. Why doesn't he try these cases here if he wants to try them? He is here on charges that he falsified three documents. It is ridiculous what the court has permitted in this case.

Very frankly, if your Honor wants to put me in, put me in right now. I ask to be relieved.

THE COURT: You are not going to be put in right now, and I am going to consider this at the end of the trial, as I have indicated to you before.

MR. COHEN: I will not be intimidated by the Court. The Court's conduct in this trial makes it a travesty of justice. This boy is being tried for the Hurok bombing; was Hurok an anti-Semite? Jurors must have read about the Hurok bombing, and know someone was killed in that bombing.

MR. JAFFE: He brought it out.

MR. COHEN: I never mentioned Hurok.

MR. JAFFE: If I may be heard, everything heard about hijacking, bombings, arrests, the government didn't bring that out. That was brought out by Mr. Cohen.

MR. COHEN: I didn't mention the name Hurok, sir. I never mentioned the name Hurok.

THE COURT: Wait a minute, gentlemen. You are only helping to make this seem ridiculous. You claim the trial is ridiculous, but it is your conduct that is doing it.

### PORTION OF RECORD PRECEDING SPECIFICATION OR PARTICULAR 11 (T.R. 1619, 1620)

THE COURT: Please sit down. Please, Mr. Cohen.

THE COURT: Never mind. Please, Mr. Cohen, sit down. I remember that testimony, and so does the jury.

### SPECIFICATION OR PARTICULAR 11 (T.R. 1626)

[BY MR. JAFFE]:

Q Now, do you recall yesterday you were questioned about some powder, and I don't want to get into the questions about some powder—

MR. COHEN: No.

A [sic]—but you testified there was a reloader at the camp; do you remember that?

A Yes.

MR. COHEN: Your Honor, I will object to that.

THE COURT: Please sit down.

MR. COHEN: There was a pile of shit at the camp, too.

THE COURT: I am getting tired of asking you to do this.

Q Do you remember you testified there was a reloader?

A Yes.

MR. COHEN: This is a joke.

### PORTION OF RECORD PRECEDING SPECIFICATION OR PARTICULAR 12 (T.R. 1677)

THE COURT: I am wondering, is this germane?

MR. COHEN: Oh, boy, is it, Oh, brother, is it germane?

MR. JAFFE: I have no objection, let him put it in, but he ought to show it to the witness first.

### SPECIFICATION OR PARTICULAR 12 (T.R. 1677A)

MR. COHEN: I will show it to the witness. There is no point in showing it to the witness.

THE COURT: Show it to the witness.

MR. COHEN: I will be happy to. He can make paper airplanes out of it for all I care.

THE COURT: Please, Mr. Cohen, this is ridiculous. No more remarks.

### SPECIFICATION OR PARTICULAR 13 (T.R. 1764–66)

[BY MR. COHEN]:

Now, he also testified to the fact that he, like many other young Jews, had heard stories of the holocaust in Europe and the assault by the Hitler Fascists upon the Jewish people which led to the deaths of six million Jews, and that motivated by that recent history of the Jewish people, by that tragic history, and motivated by the desire that never again should such a thing occur, he became a member of the Jewish Defense League.

And he told you some of the philosophy of the Jewish Defense League.

Most of you ladies and gentlemen, I think, are old enough to have lived through the Second World War and to have seen the pictures of the consequences of this holocaust.

THE COURT: I don't think we need to get into that.

MR. COHEN: Would your Honor like me to discuss a burlesque show or a rodeo or—

THE COURT: No, no.

MR. COHEN: What should I get into, your Honor?

THE COURT: There is no evidence of anything like that.

MR. COHEN: What shall I discuss, your Honor?

THE COURT: The defendant's statement is quite clear on why the Jewish Defense League is doing this.

MR. COHEN: Your Honor, the defense rests. The defense has concluded its summation.